REXNORD CORPORATION, Plaintiff–Appellant,

v.

The LAITRAM CORPORATION and Intralox, Inc., Defendants–Appellees.

No. 00–1395.

United States Court of Appeals, Federal Circuit.

Nov. 15, 2001.

Philip C. Swain, Foley, Hoag & Eliot LLP, of Boston, Massachusetts, argued for plaintiff-appellant. With him on the brief were Steven W. Phillips and Katherine M. Hamill. Of counsel on the brief was Jules Jay Morris, Invensys PLC, of Foxboro, Massachusetts.

Gregory J. Vogler, McAndrews, Held & Malloy, Ltd., of Chicago, Illinois, argued for defendants-appellees. With him on the brief were Timothy J. Malloy, Scott P. McBride, and Ronald H. Spuhler. Of counsel on the brief was Barry L. LaCour, The Laitram Corporation, of Harahan, Louisiana.

Before NEWMAN, CLEVENGER and DYK, Circuit Judges.

CLEVENGER, Circuit Judge.

Rexnord Corporation appeals a summary judgment of noninfringement granted in favor of The Laitram Corporation and Intralox, Inc., by the United States District Court for the Western District of Wisconsin. *See Rexnord Corp. v. The Laitram Corp.*, No. 99–C–0245–C (W.D. Wis. April 12, 2000). Because the district court construed the claims so as to improperly read a limitation from the written description into the claims, we reverse and remand.

I

Rexnord Corporation ("Rexnord") is the holder of U.S. Patent No. 5,634,550 ("the

'550 patent"), entitled "Direction Changing Mechanism For Transferring Articles Between Transverse Conveyors," which issued on June 3, 1997. The '550 patent is generally directed to a device used in the bottling and packaging processes of the beverage industry to transfer articles between an upstream conveyor and a downstream conveyor oriented at ninety-degree angles with respect to each other. The basic mechanics of the underlying conveyor system are fairly straightforward: as articles (*e.g.*, cans or bottles) move upstream on the surface of the first conveyor, they come into contact with a guide rail, which in turn directs the articles over to the second (or downstream) conveyor.

Historically, one problem with transferring articles from the upstream conveyor directly to the downstream conveyor was that articles would fall through the gap between the two conveyors. One solution was to place a transfer plate (*e.g.*, a sheet of metal) over the gap between the conveyors. By this simple remedy, articles moving upstream would be pushed on to the transfer plate, where they would remain until subsequent articles came along and pushed them on to the downstream conveyor, thus completing a ninety-degree corner turn. The shortcoming to this approach was that the last row of cans or bottles on the upstream conveyor would get hung up on the transfer plate because there were no subsequent cans or bottles to push them on to the downstream conveyor. Hence, when using a transfer plate, the last row of cans or bottles had to be pushed manually onto the downstream conveyor.

### A

The '550 patent is directed at an invention that employs conveyors possessing "self-clearing capability" (*i.e.*, the last row of cans or bottles does not need subsequent cans or bottles to complete the transfer to the downstream conveyor). The way the '550 invention achieves its self-clearing capabilities is by using a specially-shaped "transfer conveyor" placed in the gap between the two conventional conveyors, and oriented alongside the upstream conveyor. The transfer conveyor has a "portion" that projects, or cantilevers, out from one side of the transfer conveyor to extend over the gap and the "transition section" of the downstream conveyor (*i.e.*, the end portion of the downstream conveyor that curves downward around the sprocket):

transfer conveyor

transition section

cantilevered portion

By using a transfer conveyor instead of a static transfer plate, the last row of cans or bottles can be transferred from the upstream conveyor to the downstream conveyor without manual intervention.

According to the '550 patent, the flat, article-carrying surface of the transfer conveyor can be created by interlinking many individual pieces, called "chain links," together with "chain pins." The "chain links" have two portions: (1) a "link

module portion" and (2) a "cantilevered portion." Below is an illustration of a "chain link" as disclosed in the '550 patent:

The asserted claims in the '550 patent are claims 5 and 12–19, of which claims 5, 12, and 16 are independent claims. Listed below are claims 5, 12, and 16 in relevant part:

5. A conveyor apparatus comprising ... a first conveyor ... including ... a transition section ... and a second conveyor ... including a plurality of elongated chain pins, and a plurality of *chain links ... including a link module portion ... and a cantilevered portion extending laterally from said link module portion and away from from [sic] said chain pins* and into overhanging relation to said transition section of the first conveyor to provide an extension of said second conveyor article supporting surface, and including a *lower edge portion* contoured to follow the arcuate path of said transition section.

12. A conveyor chain comprising a plurality of *chain links each including a link module portion ... and a second portion extending ... in cantilevered relation* from only one of said sides of said link module portion....

16. A conveyor chain adapted for use with a transversely oriented conveyor ... comprising a plurality of *chain link modules* extending transversely with re-

spect to the direction of movement of the conveyor chain and *each ... having ... a second side edge ... arranged to extend in cantilevered relation* over a portion of the transversely oriented conveyor to facilitate direct transfer of articles there between....

'550 patent, col. 11, line 12—col. 14, line 5 (emphases added).

The Laitram Corporation and Intralox, Inc. (collectively, "Laitram") manufacture and sell conveyor systems under the name "Live Transfer Belt" or "ONE PIECE Live Transfer Belt." *Rexnord Corp.*, slip op. at 15. There is no dispute that each of Laitram's accused conveyor belts contains chain links having a one-piece construction, that is, the link module portion and the cantilevered portion are of one piece.

B

Rexnord filed suit against Laitram, alleging, *inter alia*, that Laitram's "Live Transfer Belt" and "ONE PIECE Live Transfer Belt" products infringed claims 5 and 12–19 of the '550 patent. Both parties subsequently filed cross-motions for summary judgment on the issue of infringement. In addition, Laitram filed a motion for summary judgment of patent invalidity and trade secret misappropriation. On April 12, 2000, the district court awarded summary judgment of noninfringement,

both literally and under the doctrine of equivalents, in favor of Laitram. It then declared the invalidity issue moot and denied Laitram's trade secret misappropriation summary judgment motion. Rexnord now appeals the district court's summary judgment of noninfringement.

## II

We review the grant of summary judgment *de novo.* *Conroy v. Reebok Int'l, Ltd.,* 14 F.3d 1570, 1575, 29 USPQ2d 1373, 1377 (Fed.Cir.1994). In doing so, we must keep in mind that summary judgment is appropriate only if there is no genuine issue of material fact. *See* Fed.R.Civ.P. 56(c). To this end, the court must draw all reasonable factual inferences in favor of the nonmoving party. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

An infringement analysis is a two-step process in which the court first determines, as a matter of law, the correct claim scope, and then the fact-finder compares the properly construed claim to the accused device to determine, as a matter of fact, whether all of the claim limitations are present, either literally or by a substantial equivalent, in the accused device. *Johnson Worldwide Assocs., Inc. v. Zebco Corp.,* 175 F.3d 985, 988, 50 USPQ2d 1607, 1609 (Fed.Cir.1999); *Renishaw PLC v. Marposs Societa' per Azioni,* 158 F.3d 1243, 1247–48, 48 USPQ2d 1117, 1120 (Fed.Cir.1998); *General Mills, Inc. v. Hunt–Wesson, Inc.,* 103 F.3d 978, 981, 41 USPQ2d 1440, 1442 (Fed.Cir.1997). Because questions regarding the construction of the claims are issues of law, we review them without deference to the district court. *Cybor Corp. v. FAS Techs., Inc.,* 138 F.3d 1448, 1456, 46 USPQ2d 1169, 1174 (Fed.Cir.1998) (en banc).

The dispositive question in this case is whether the word "portion" as used in the claims of the '550 patent should be limited to parts of an object that are "separate," as opposed to parts that can be either "separate" or "integral." Since each of Laitram's accused conveyor belts contains chain links having an integral, or one-piece construction, Rexnord contends that the broader interpretation should be adopted. Not surprisingly, Laitram argues that the narrower interpretation requiring separate parts should prevail.

## A

Cases presenting issues of claim interpretation are often close. When words used in claims have more than one possible meaning, our canons of claim interpretation are the tools that permit resolution of disputes as to the correct meaning of claim language. In this case, the district court recognized that the word "portion" could be defined, from the perspective of dictionary sources, as both Rexnord and Laitram contend. The district court correctly understood the need to examine the intrinsic record of the patent, its specification and its file history, to determine which meaning of the term must govern. Examination of a specification or of a file history entails close scrutiny. For the reasons set forth below, we conclude that the district court's analysis of the specification and the file history led it to the wrong legal conclusion.

We begin our claim construction analysis as it always should: with the language of the claims. *Johnson Worldwide Assocs.,* 175 F.3d at 989, 50 USPQ2d at 1610; *Renishaw PLC,* 158 F.3d at 1248, 48 USPQ2d at 1120; *Abtox, Inc. v. Exitron Corp.,* 122 F.3d 1019, 1023, 43 USPQ2d

1545, 1548 (Fed.Cir.1997). As we have often stated before, as a general rule, all terms in a patent claim are to be given their plain, ordinary and accustomed meaning to one of ordinary skill in the relevant art. *Toro Co. v. White Consol. Indus., Inc.,* 199 F.3d 1295, 1299, 53 USPQ2d 1065, 1067 (Fed.Cir.1999) ("[W]ords in patent claims are given their ordinary meaning in the usage of the field of the invention, unless the text of the patent makes clear that a word was used with a special meaning."); *Johnson Worldwide Assocs.,* 175 F.3d at 989, 50 USPQ2d at 1610; *Renishaw PLC,* 158 F.3d at 1249–50, 48 USPQ2d at 1120. In addition, unless compelled to do otherwise, a court will give a claim term the full range of its ordinary meaning as understood by an artisan of ordinary skill. *Johnson Worldwide Assocs.,* 175 F.3d at 989, 50 USPQ2d at 1610; *Specialty Composites v. Cabot Corp.,* 845 F.2d 981, 985–88, 6 USPQ2d 1601, 1603–06 (Fed.Cir.1988) (term "plasticizer" given full range of ordinary and accustomed meaning to those of ordinary skill in the arts of polymer chemistry and the plastics industry). Furthermore, a claim term should be construed consistently with its appearance in other places in the same claim or in other claims of the same patent. *See Phonometrics, Inc. v. Northern Telecom Inc.,* 133 F.3d 1459, 1465, 45 USPQ2d 1421, 1426 (Fed.Cir. 1998) ("A word or phrase used consistently throughout a claim should be interpreted consistently."); *CVI/Beta Ventures, Inc. v. Tura LP,* 112 F.3d 1146, 1159, 42 USPQ2d 1577, 1586 (Fed.Cir.1997) ("[W]e are obliged to construe the term 'elasticity' consistently throughout the claims."); *Southwall Techs., Inc. v. Cardinal IG Co.,* 54 F.3d 1570, 1579, 34 USPQ2d 1673, 1679 (Fed.Cir.1995) (holding that claim terms found in different claims should be interpreted consistently).

Once a disputed claim term is identified by the parties and its plain meaning to the ordinarily skilled artisan is ascertained by the court, the next step is to examine the written description and the drawings to confirm that the patentee's use of the disputed terms is consistent with the meaning given to it by the court. *Watts v. XL Sys., Inc.,* 232 F.3d 877, 882, 56 USPQ2d 1836, 1839 (Fed.Cir. 2000); *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 979, 34 USPQ2d 1321, 1329 (Fed.Cir.1995) ("Claims must be read in view of the specification, of which they are a part."), *aff'd,* 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996). This confirmatory step is necessary for several reasons. First, patent law permits the patentee to choose to be his or her own lexicographer by clearly setting forth an explicit definition for a claim term that could differ in scope from that which would be afforded by its ordinary meaning. *Mycogen Plant Science v. Monsanto Co.,* 243 F.3d 1316, 1327, 58 USPQ2d 1030, 1039 (Fed.Cir.2001) ("[A] patentee is free to be his own lexicographer, Search Term End so long as the special definition of a term is made explicit in the patent specification or file history."). Second, because a claim construction that would exclude the preferred embodiment "is rarely, if ever, correct and would require highly persuasive evidentiary support," *Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1583, 39 USPQ2d 1573, 1578 (Fed.Cir.1996), a court mindful of this canon of construction would need to examine the written description and the drawings to determine whether the preferred embodiment falls within the scope of a construed claim. *Hoechst Celanese Corp. v. BP Chems. Ltd.,* 78 F.3d 1575, 1580–81, 38 USPQ2d 1126, 1130 (Fed.Cir.1996) (refusing to

adopt a claim construction of "stable" that would exclude the preferred embodiment disclosed in the specification); *cf. Elekta Instrument S.A. v. O.U.R. Sci. Int'l, Inc.,* 214 F.3d 1302, 1308, 54 USPQ2d 1910, 1914 (Fed.Cir.2000) (adopting a claim construction in light of the prosecution history and the unambiguous language of an amended claim which excluded a preferred and sole embodiment disclosed in the specification).

Furthermore, an examination of the written description and drawings is necessary to determine whether the patentee has disclaimed subject matter or has otherwise limited the scope of the claims. *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.,* 242 F.3d 1337, 1344, 58 USPQ2d 1059, 1065 (Fed.Cir.2001) (relying on a disclaimer in the written description of subject matter that could have otherwise fallen within the scope of the claim language); *Watts,* 232 F.3d at 882, 56 USPQ2d at 1840 (restricting claim limitation to a particular structure based in part on distinguishing remarks contained in the specification). And, of course, if "the term or terms chosen by the patentee so deprive the claim of clarity that there is no means by which the scope of the claim may be ascertained" by one of ordinary skill in the art from the language used, a court must look to the specification and file history to define the ambiguous term in the first instance. *Johnson Worldwide Assoc.,* 175 F.3d at 990, 50 USPQ2d at 1610.

After examining the written description and the drawings, the same confirmatory measure must be taken with the prosecution history, since statements made during the prosecution of a patent may affect the scope of the invention. *See*

*Biodex Corp. v. Loredan Biomedical, Inc.,* 946 F.2d 850, 862–63, 20 USPQ2d 1252, 1262 (Fed.Cir.1991) (affirming the use of prosecution history to construe a claim). The comprehensive examination of the claims, the specification, and the prosecution history in the claim construction process is not meant to impose an undue burden on the district court, but instead serves to ensure that all pertinent intrinsic evidence is considered in the proper interpretation of a claim. *Markman,* 52 F.3d at 979, 34 USPQ2d at 1329 ("To ascertain the meaning of claims, we consider three sources: The claims, the specification, and the prosecution history.") (quoting *Unique Concepts, Inc. v. Brown,* 939 F.2d 1558, 1561, 19 USPQ2d 1500, 1503 (Fed.Cir. 1991)). Likewise, the parties should provide the district court with all relevant arguments and point out with specificity the relevant statements in the specification and prosecution history in support of their arguments.

In this case, the district court noted that the plain, ordinary meaning of "portion" included two possible readings— parts that were "separable from the whole" and parts that were "not separated from the whole." *Rexnord,* slip op. at 24– 25. Instead of giving the term the full range of its ordinary meaning (which would encompass both readings), the district court incorrectly concluded that the term was uncertain. *Id.* Upon considering the intrinsic evidence, the district court determined in the first instance that the term should be construed to have the narrower meaning of "separate" parts. In doing so, the district court relied solely on the preferred embodiment in the written description and its drawings (which admittedly reads on the narrower meaning of the key word) and on one passage from the

prosecution history. Concerning the latter, the district court concluded that the examiner's objection during prosecution to a particular paragraph structure used in an original claim implied that the examiner viewed the "portions" to be separate pieces. *Rexnord,* slip op. at 36–37. For the reasons explained below, we conclude that the district court erred in its assessment of the written description and of the prosecution history.

B

The parties agree that the dictionary definition of "portion" is "a part of any whole, either separated from or integrated with it." *Random House Unabridged Dictionary* 1507 (2d ed 1993). Hence, according to its ordinary meaning, so long as a "portion" of an object is a "part" of that object, it can connote either the quality of being "separate" or of being "integral." That there is no doubt that "portion" has a broad meaning is evidenced by Laitram's explicit concession at oral argument that the dictionary definition contemplates both meanings.

In the '550 patent, the patentee used the word "portion" in the phrases "link module portion" and "cantilevered portion" to describe the two parts of the "chain link."[1] The district court construed the claims so as to require the "link module portion" and the "cantilevered portion" to not only be distinct *parts* of the "chain links" (which is agreed by both parties to be proper) but also to be *separate from one another.* In

so doing, the district court held that the claimed "chain link" structure must be limited to a two-piece embodiment, as opposed to encompassing both one and two-piece embodiments. The primary rationale articulated by the district court for its claim construction was that, of the embodiments Rexnord alleged to be disclosed by the '550 patent, the only one described with detail in the written description and depicted in the drawings of the '550 patent was a two-piece embodiment. *Rexnord,* slip op. at 28–31. The district court also noted that no "figure or embodiment described in the specification describes a one-piece construction *explicitly.*" *Id.* at 31 (emphasis added).

Our case law is clear that an applicant is not required to describe in the specification every conceivable and possible future embodiment of his invention. *See SRI Int'l v. Matsushita Elec. Corp. of America,* 775 F.2d 1107, 1121, 227 USPQ 577, 585 (Fed.Cir.1985) (en banc). "[I]f structural claims were to be limited to devices operated precisely as a specification-described embodiment is operated, there would be no need for claims. Nor could an applicant, regardless of the prior art, claim more broadly than that embodiment." *Id.* In short, it is the claims that measure the invention, as informed by the specification. As we noted long ago: "Specifications teach. Claims claim." *Id.* at 1121 n. 14, 585 n. 14.

Since the preferred embodiment of the invention, in all of its representations

---

1. Although claims 12 and 16 contain slight variations of the phrases "link module portion" and "cantilevered portion" used in claim 5, these differences are insignificant for the purposes of this appeal. For instance, claim 12 uses "second portion" instead of "cantilevered portion." But the operative language, "portion," remains the same. Also, claim 16 uses "first side edge" and "second side edge." However, for purposes of Laitram's motion for summary judgment of noninfringement, the parties agree that "side edge" is equivalent to "end portion." *Rexnord,* slip op. at 27.

(drawings and text), is a two-piece structure (the "link module portion" being separate from the "cantilevered portion"), one would not expect to find a description of an "integral" structure under the heading of "Description of A Preferred Embodiment." Indeed, no one contends that the preferred embodiment could be an integral structure. Therefore, references to the preferred embodiment simply beg the dispositive question, rather than answer it.

When we examine the section in the written description entitled, "Summary of the Invention" (a pertinent place to shed light upon what the patentee has claimed), we find only three references to distinct embodiments that mention "link modules" and "cantilevered" portions. One of the three embodiments unquestionably teaches a "separate" attachment. '550 patent, col. 2, ll. 34–39 ("In one embodiment . . . [e]ach chain link includes a molded plastic link module . . . and an *attachment* that is *mountable* in cantilevered relation on the side of the link module." (emphases added)). This teaching should come as no surprise, since there is no dispute that the plain meaning of the word "portion" is broad enough to cover separate structures. Significantly, though, the other two embodiments do not describe two-piece, or separate, constructions. In fact, the embodiment disclosed at column 2, lines 40–57, is described completely without the use of any words that connote a quality of being "separate"—such as "attachment," "mountable," "second piece," or "securable." *Cf.*, '550 patent, col. 8, ll. 61–64 ("Each of the chain links 256 also includes a *second piece* comprising an *attachment* 272 that is *securable* in cantilevered relation to a link module 260 . . . ." (emphases added)). Similarly, the embodiment disclosed from col. 2, line 63, to col. 3, line 9, describes another embodiment without the

use of any words that might connote a "separate" attachment. Hence, in the "Summary of the Invention" section, there are *two* embodiments that support a broader interpretation of "portion," as opposed to *one* embodiment that requires "separate" parts. Moreover, the written description explicitly states that aside from the preferred embodiment, "[t]he invention is capable of other embodiments and of being practiced or being carried out in various ways." '550 patent, col. 3, ll. 57–59. The inventor was careful to consistently use phrases throughout the written description such as: "In one embodiment . . .", "Before one embodiment . . .", "of other embodiments . . .", "of a preferred embodiment . . .", or "In the particular embodiment. . . ." These phrases reflect the inventor's teaching that his invention could be embodied "in various ways." Finally, the inventor explicitly qualified his detailed "Description of A Preferred Embodiment" by stating that "it is to be understood that the invention is not limited in its application to the details of construction and the arrangements of components set forth in the following description or illustrated in the drawings." '550 patent, col. 3, ll. 54–57.

When the claim language is assessed on its own, and when the written description is examined carefully, one finds that the patentee has described an invention that embraces, through the word "portion," structure that may be either "integral" or "separate."

■ Given that the plain meaning of "portion" and the specification both support an interpretation that can cover either one-piece or two-piece embodiments, the remaining inquiry is whether such construction must be altered or discarded because of statements made during the pros-

ecution history. The district court singles out a part of the prosecution history where the examiner contested the accuracy of the inventor's indented paragraph structure in proposed claim 33 (issued as claim 5). The examiner stated:

> The paragraph in [claim 33] defining the "cantilevered portion ..." must be moved to the left to line up with "a link module portion" because the cantilevered portion is defined as "extending laterally from said link module portion" and therefore can not also be part of the link module portion as claimed.

To spell out our understanding of the examiner's rejection, the following is proposed claim 33 as originally presented to the examiner with lines and arrows added to convey the thrust of the examiner's remarks:

33. A conveyor apparatus comprising

a frame,

a sprocket supported by said frame,

a first conveyor supported by said frame and including

> an article supporting surface defining a plane, and
>
> a transition section supported by said sprocket along an arcuate path deviating from said plane, and

a second conveyor supported by said frame, oriented transversely to said first conveyor, and including

> a plurality of elongated chain pins, and
>
> a plurality of *chain links* interconnected by said chain pins and respectively including

a <u>link module portion</u> including

> an article supporting surface generally coplanar with said article supporting surface of said first conveyor, and
>
> a <u>cantilevered portion</u> extending laterally from said link module portion, from said chain pins, extending over said sprocket, and into overhanging relation to said transition section of the first conveyor to provide an extension of said second conveyor article supporting surface, and including
>
>> a lower edge portion contoured to follow the arcuate path of said transition section.

(emphases added). The examiner, in rejecting the proposed claim, made it explicitly clear that the basis for his rejection was that, from a logical standpoint, the paragraph structure was *inaccurate*, as opposed to being *too broad* in light of the prior art. In other words, the examiner rejected the proposed claim because, as a technical matter, if the "cantilevered portion" was "extending laterally from" the "link module portion," it could not be simultaneously *a part of* the "link module portion" (as suggested by the alignment in the original indented paragraph structure). It is significant that the examiner made no explicit reference or hint to any notion of "separate" or "integral." The district court, however, interpreted the examiner's

statements, without further elaboration, to compel the conclusion that the examiner must have viewed "the cantilevered portion as *a separate part* of the chain link with equal status to the link module." *Rexnord,* slip op. at 36 (emphasis added). Although, no doubt, the "cantilevered portion" shares distinct and equal status with the "link module portion" from a hierarchical standpoint, it does not necessarily follow that the two portions must be "separate."

For example, a typical tapered bottle includes a "cylindrical portion" and a "neck portion." It would indeed be technically inaccurate to describe the bottle as including a "cylindrical portion" which, in turn, includes a "neck portion" (especially if the "neck portion" is described as "extending laterally from" the "cylindrical portion"). The inaccuracy stems from the fact that the "neck portion" should not be viewed as a sub-part of the "cylindrical portion," but rather, should possess equal status with the "cylindrical portion" as parts of the same bottle. Hence, to be accurate, the bottle ought to be described simply as having a "cylindrical portion *and* a neck portion." However, it does not follow, as made obvious by this simple illustration, that the two "portions" must be physically *separate.* There is no doubt that within the structure of a bottle, the "cylindrical portion" and the "neck portion" must be integral. Therefore, although the "link module portion" and the "cantilevered portion" possess equal status as distinct parts of the "chain link," it cannot be said that they must be separate. The district court arrived at its contrary conclusion based solely on the preferred embodiment and a single piece of prosecution history which is simply silent regarding the notions of "separate" and "integral."

At most, the prosecution history is inconclusive regarding the proper interpretation of the word "portion." If read as the district court did, the examiner's comments make no sense; if read properly to require clarification that the "link module portion" and the "cantilevered portion" have equal status, the examiner's comments support a broad reading of "portion." Furthermore, we may presume that the examiner gave the terms in the proposed claim their "broadest reasonable interpretation consistent with the specification," since he was obliged to do so. *See Hyatt v. Boone,* 146 F.3d 1348, 1355, 47 USPQ2d 1128, 1133 (Fed.Cir.1998) (regularity of routine administrative procedures is presumed); *In re Hyatt,* 211 F.3d 1367, 1372, 54 USPQ2d 1664, 1667 (Fed.Cir.2000) ("[D]uring examination proceedings, claims are given their broadest reasonable interpretation consistent with the specification."); *see also* Manual of Patent Examining Procedure § 2111 ("Claim Interpretation; Broadest Reasonable Interpretation"). Given the examiner's obligation to confer the broadest reasonable interpretation on "portion," if the examiner wanted to hinge patentability upon the "link module portion" being structurally separate from the "cantilevered portion," he would have said so, and required a specific amendment to reflect the separate structures.

Moreover, elsewhere in the claims, the word "portion" is used by the patentee to indicate parts of the invention that are undisputably "integral" with their neighboring parts. In claim 5, the patentee makes reference at col. 11, line 8, to a "lower edge portion" that no doubt refers to an integral part of the "cantilevered portion." This "lower edge portion" is the arc-shaped part on the bottom of the "cantilevered portion" referred to in the written description as "stiffeners or gusset members on the underside of the top

plate." '550 patent, col. 9, ll. 19 20. In claim 16, the patentee also specifies that the chain link modules must "extend in cantilevered relation over a *portion* of the transversely oriented conveyor" which, again, no doubt refers to an integral part of the transversely oriented conveyor. '550 patent, col. 14, ll. 3–4.

"lower edge portion"

"portion of the transversely oriented conveyor"

Given the claim language's abundantly clear use of the word "portion" to refer to parts that are "integral" and not "separate," we are obliged to give "portion" the broader interpretation that encompasses both "separate" and "integral" parts of the invention. The fact that the patentee did not explicitly disclose a one-piece embodiment in the specification or that the examiner failed to require an illustration of a one-piece construction is not enough to import a "separate" limitation from the specification into the claims.

In the end, we have a term, "portion," that is unambiguous in encompassing meanings of both "integral" and "separate." When the *invention* is being described in the specification (as opposed to when the preferred embodiment is being described), we have two distinct embodiments distinguished from one other embodiment. With the score two to one (*i.e.*, two embodiments broadly defined as opposed to one narrowly described), the embodiments not restricted to "separate" structures must be understood to refer to a single structure that includes both the "link module" and "cantilevered" portions.

The only possible basis for dismissing the otherwise dispositive intrinsic evidence requiring "portion" to mean both "inte-

gral" and "separate" is the isolated comment by the examiner. It is true that the two embodiments permitting "integral" parts both refer to a "cantilevered portion extending laterally from the link module portion," which of course is the language of the claim itself. Indeed, the reason why the examiner required original claim 33 to be rewritten as it now appears in claim 5 was the examiner's conclusion that if something is "extending laterally from" other structure (*viz.*, the "cantilevered portion" "extending laterally from" the "link module portion"), the two structures must be distinct (as opposed to separate). As noted earlier, we reject the notion that the examiner's requirement that the paragraph structure of claim 33 be rearranged is dispositive of the claim interpretation issue.

For the foregoing reasons, we hold that the district court should have construed "portion" broadly to contemplate parts that are either "separate" or "integral." Because the district court unnecessarily limited the meaning of the disputed term, we reverse and remand for proceedings consistent with this opinion.

REVERSED and REMANDED.